IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH L. GRIMES, | ) | CASE NO. 5:20-cv-01024 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kenneth L. Grimes ("Plaintiff" or "Grimes") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

### A.    Prior applications

Prior to filing the application for SSI that is the subject of this appeal, Grimes had filed two earlier applications.  Tr. 97.  They were filed on September 15, 2010, and on December 7, 2012.  Tr. 97.  Both applications proceeded to hearings before administrative law judges.  Tr. 97, 212.  The application of December 7, 2012 was denied by an administrative law judge on May 8, 2015.  Tr. 97, 209-277.  No appeal was taken from that decision.[1]

---

[1] It is not clear from the record whether the September 15, 2010, application proceeded beyond the hearing level.

1

**B.** **Current application**

On October 7, 2016, Grimes protectively filed an application for SSI.[2]  Tr. 97, 183, 330-335. Grimes alleged a disability onset date of May 9, 2015.  Tr. 97, 183, 330.  He alleged disability based on PTSD; bipolar disorder; severe depression; lumbar spinal fusion; cervical spine, back and right shoulder problems; arthritis; and sleep apnea with CPAP.  Tr. 229, 242, 256, 266.  After initial denial by the state agency (Tr. 256-262) and denial upon reconsideration (Tr. 266-271), Grimes requested a hearing (Tr. 272-274).  On January 11, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 180-208.

On February 25, 2019, the ALJ issued an unfavorable decision (Tr. 94-112), finding that Grimes had not been under a disability within the meaning of the Social Security Act since October 7, 2016, the date the application was filed (Tr. 98, 107).  In reaching his decision, the ALJ considered the prior May 8, 2015, decision but concluded there was "new and material evidence in the case at hand, particularly involving [Grimes'] use of his upper extremities" and therefore indicated he was not bound by the prior administrative law judge's May 8, 2015, findings.  Tr. 97.  Grimes requested review of the ALJ's decision by the Appeals Council. Tr. 324-326.  On March 11, 2020, the Appeals Council denied Grimes' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

**A.** **Personal, educational, and vocational evidence**

---

[2] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/18/2021).

Grimes was born in 1967.  Tr. 330.  He was 51 years old at the time of the hearing and was living with a friend/neighbor.  Tr. 182, 190.  Grimes graduated from high school and had some vocational training.  Tr. 192.  Grimes worked various jobs through temporary agencies.  Tr. 185-190.  He explained that the jobs consisted mostly of factory/manufacturing type work.  Tr. 186-190.

## B.    Medical evidence

### 1.    Physical impairments

On October 6, 2015, Grimes saw Dr. Gina Horne, D.O., with White Pond Internal Medicine, for follow up regarding an injury to his right index finger that occurred in September and resulted in a visit to the emergency room.  Tr. 423.  His finger had become infected.  Tr. 423.  Grimes reported having no appetite and abnormal weight loss.  Tr. 423-424.  Grimes also requested a referral to podiatry for callouses on his great toes bilaterally.  Tr. 423.  He indicated that the callouses were painful and it was difficult to walk without shoes.  Tr. 423.  Dr. Horne ordered some testing for unexplained weight loss, provided Grimes with a podiatry referral, and recommended follow up in one month.  Tr. 424.

Grimes saw Dr. Horne on November 11, 2015, for follow up.  Tr. 431.  Grimes ended up needing surgery to repair a tendon in his right hand on November 10, 2015.  Tr. 431.  He was continuing to have pain and intense sensitivity in his finger and numbness around the palm and tip of his finger.  Tr. 431.  Grimes relayed that he felt good overall.  Tr. 431.  He was following with psychiatry and his mood was stable with medication.  Tr. 431.  Grimes' appetite and energy were good and he had no other complaints.  Tr. 431.  Dr. Horne's musculoskeletal examination revealed a normal range of motion but there was edema and tenderness.  Tr. 432.  Grimes had a normal mood and affect.  Tr. 432.  Dr. Horne listed the following conditions – major depressive

3

disorder, single episode, moderate; PTSD; degeneration of lumbar or lumbosacral intervertebral disc; and finger infection.  Tr. 432.  Dr. Horne recommended that Grimes continue all medications as directed, follow up with psychiatry as directed, follow up with ortho regarding his recent surgery, work on diet and exercise for general health, and follow up in six months.  Tr. 432.

An MRI of Grimes' right shoulder taken in December 2015 showed no evidence of rotator cuff tear, but it did show distal anterior supraspinatus tendinitis/tendinopathy, tendinitis//tendinopathy of the proximal aspect of the intracapsular portion of the biceps tendon, trace of non-specific fluid in the subacromial-subdeltoid bursa, mild hypertrophic change of the acromioclavicular joint, and a lipoma between the coracoid and distal clavicle.  Tr. 814-815.

Grimes had imaging of his lumbar spine performed in January 2016 at the Crystal Clinic. Tr. 808.  That imaging showed "[i]nstrumented lumbar fusion L4-S1 with broken hardware at the S1 level."  Tr. 808.

Grimes was in a motor vehicle accident in September 2016 (Tr. 491) and received some physical therapy during which time he complained of right-sided neck pain with radicular symptoms into his right hand and low back pain with radicular symptoms into his legs bilaterally (Tr. 484-491).

On November 2, 2016, Grimes saw Dr. Rebekka Hom, M.D., of Summa Physicians, Inc., for a follow-up visit after having been seen in the emergency room the week prior for stabbing pain all over his back.  Tr. 460.  Grimes relayed that he had been unable to walk.  Tr. 460. During his visit with Dr. Hom, Grimes reported a history of chronic back pain and past flare ups. Tr. 460.  Also, he had a lumbar spinal fusion performed years prior.  Tr. 460.  Following his emergency room visit, Grimes was sent home with Percocet; no imaging was performed.  Tr.

460.  Grimes wanted a refill of his Percocet since he was on his last day of what had been

prescribed at the emergency room.  Tr. 460.  Grimes was being seen by pain management and

had been receiving epidural injections.  Tr. 460.  However, his insurance was no longer covering

the cost of the injections.  Tr. 460.  Grimes was in the process of switching to Caresource and

possibly a new pain management doctor.  Tr. 460.  Grimes had also complained of abdominal

pain when he was at the emergency room.  Tr. 460.  He had been having abdominal symptoms

for months but the acute symptoms had resolved at the time of his visit with Dr. Hom.  Tr. 460.

On physical examination, Dr. Hom observed no spinal or paraspinal tenderness to palpation; a

normal gait; and decreased proximal muscle strength but very poor effort.  Tr. 461.  Grimes'

abdominal examination was normal.  Tr. 461.

      Dr. Hom assessed chronic bilateral low back pain, with sciatica presence unspecified.  Tr.

461.  Dr. Hom started Grimes on a short course of steroids for his acute and chronic back pain.

Tr. 461.  She declined to refill Grimes' Percocet, noting that, since he already was established

with pain management, he would need to get his refill from them.  Tr. 461.  Dr. Hom also

explained that, even if he could not get injections at that time, pain management could assess him

and might be able to recommend other medical therapy.  Tr. 461.  Grimes declined that option

and indicated that he wanted to get a new pain management doctor once he was able to switch

his insurance to Caresource.  Tr. 461.

      During a physical therapy session on November 14, 2016, Grimes complained of severe

back pain and indicated that he almost returned to the emergency room again due to his level of

pain.  Tr. 485.  Grimes was unable to complete any exercise at therapy due to his pain and he

was advised to follow up with his doctor.  Tr. 485.

On January 9, 2017, state agency reviewing physician Dr. Gerald Klyop, M.D., completed a physical RFC assessment – he adopted the prior ALJ's RFC dated May 8, 2015.  Tr. 235-236.

On March 6, 2017, Grimes saw Dr. Horne with complaints of shortness of breath, a runny nose, cough, and sore throat.  Tr. 503.  During an examination, Dr. Horne noted wheezing but no respiratory distress.  Tr. 504.  There was pressure under Grimes' eyes.  Tr. 504.  Grimes had normal range of motion in his neck.  Tr. 504.  Grimes' mood and affect were normal.  Tr. 504.  Dr. Horne assessed bronchitis, chronic rhinitis, and bilateral impacted cerumen.  Tr. 504.  Other past medical diagnoses included cervical spondylosis without myelopathy; degeneration of lumbar or lumbosacral intervertebral disc; and pain in joint, shoulder region.  Tr. 503-504.

Grimes saw orthopedic resident Jared Pate, M.D., at Akron General on March 3, 2017, for his bilateral shoulder pain.  Tr. 525.  Dr. Pate noted that Grimes had a long-standing history of lumbar spine pain; he had an L4-S1 spinal fusion in 2011 with recurrent radicular symptoms and low back pain with two broken screws in the S1.  Tr. 525.  Dr. Pate also noted that lumbar epidural injections and water therapy had made Grimes' pain manageable but his insurance company had stopped covering the injections even though they were helping.  Tr. 525.  Grimes complained of some radicular pain in his right leg without weakness.  Tr. 525.  Grimes had restarted water therapy but he was continuing to have pain.  Tr. 525.  Grimes reported right shoulder rotator cuff impingement that had been treated effectively with injections and physical therapy.  Tr. 525.  Grimes had neck pain that was possibly contributing to his shoulder pain.  Tr. 525.  Grimes also complained of left shoulder pain.  Tr. 525.

On examination, Dr. Pate observed that Grimes ambulated with a cane but his gait and reflexes were normal and his sensation was grossly intact.  Tr. 525.  Dr. Pate noted that Grimes

had positive impingement signs in the right and left upper extremities but 5/5 strength with flexion/extension and shoulder abduction.  Tr. 525.  Examination of the bilateral lower extremities revealed no focal neuro deficits.  Tr. 525.  Dr. Pate administered a subacromial injection for his rotator cuff impingement.  Tr. 525-526.  Dr. Pate noted that an MRI of the cervical spine had been completed and showed degenerative disease and central stenosis at the C3-7 level.  Tr. 526.  Dr. Pate ordered six weeks of therapy and aqua therapy for the shoulder, cervical-spine and lumbar spine.  Tr. 526.  Dr. Pate also indicated that Grimes would continue using his cane.  Tr. 526.

On May 5, 2017, Grimes saw orthopedic resident Patrick Kane, M.D., at Akron General, for his multiple orthopaedic problems.  Tr. 523.  Aqua therapy had helped but Grimes had used all of his allowable aqua therapy sessions.  Tr. 523.  On examination, Dr. Kane observed that Grimes ambulated with a cane but his gait and reflexes were normal and his sensation was grossly intact.  Tr. 523.  Dr. Kane noted that Grimes had positive impingement signs in the right and left upper extremities but 5/5 strength with flexion/extension and shoulder abduction.  Tr. 523.  Examination of the bilateral lower extremities revealed no focal neuro deficits.  Tr. 523.

Dr. Kane's assessment was bilateral shoulder rotator cuff impingement, lumbar spine pain with radicular symptoms and failed hardware, and cervical spine pain.  Tr. 523.  With respect to the bilateral shoulder pain, Dr. Kane recommended another injection in six weeks since that had helped improve Grimes' pain in the past.  Tr. 523.  Dr. Kane also prescribed Mobic and recommended that Grimes continue with home exercises and anti-inflammatories.  Tr. 523.  With respect to Grimes' cervical spine, Dr. Kane noted that an MRI showed degenerative disease and central stenosis at the C3-7 level.  Tr. 523.  Dr. Kane recommended that they continue to monitor the cervical spine condition and that Grimes return to pain

7

management.  Tr. 523.  While Grimes was waiting to get back into pain management, Dr. Kane provided Grimes with a prescription for Gabapentin for his neuropathic pain.  Tr. 523-524.  No additional notations were made regarding continued use of a cane.

On June 6, 2017, upon reconsideration, state agency reviewing physician Dr. Abraham Mikalov, M.D., completed a physical RFC assessment – he, as did Dr. Klyop, adopted the prior ALJ's RFC dated May 8, 2015.  Tr. 248.

Grimes continued to follow up with the orthopedic department at Akron General.  On June 30, 2017, Grimes reported some radicular symptoms on his left side, including numbness/tingling in his fingertips.  Tr. 572.  Grimes reported that the injections he had in March 2017 had really helped with his right shoulder pain.  Tr. 572.  He was still complaining of pain in the left shoulder and was interested in receiving another injection on the left side.  Tr. 572.  Grimes was scheduled for an upcoming appointment with pain management.  Tr. 572.  On examination, Grimes' gait and reflexes were normal and he ambulated without an assistive device.  Tr. 573.  His sensation was grossly intact.  Tr. 573.  Strength was 5/5 in the upper extremities but there were positive impingement signs in the left upper extremity.  Tr. 573.  Examination of bilateral lower extremities revealed no focal neuro deficits.  Tr. 573.  Grimes was no longer complaining of leg pain and had improved overall since his prior visit.  Tr. 573.  Grimes received an injection on his left side and he was advised to return to physical therapy and perform his home shoulder exercises.  Tr 573.

Grimes was seen in the orthopedic department again on December 22, 2017, for his bilateral shoulder impingement symptoms.  Tr. 577.  Grimes reported significant pain relief from cervical facet blocks.  Tr. 577.  He was doing therapy at home with some pain relief and he was taking anti-inflammatories.  Tr. 577.  His shoulder pain was worse while sleeping on his

shoulders at night.  Tr 577.  Grimes was interested in another set of injections.  Tr. 577.  An MRI of the left shoulder was recommended for further evaluation of impingement and rotator cuff pathology.  Tr. 580.  He was referred back to pain management for further cervical spine management.  Tr. 580.  Injections into the bilateral subacromial spaces were administered.  Tr. 580.  Grimes was advised to continue with his home therapy and anti-inflammatories.  Tr. 580.

During an orthopedic appointment on February 23, 2018, for follow up regarding his left shoulder MRI, Grimes' main complaint was his neck pain.  Tr. 587.  Grimes' left shoulder MRI, taken on January 6, 2018, showed very mild tendinosis of subscapularis and supraspinatus tendons without evidence of tear; no significant shoulder pathology.  Tr. 590.  It was noted that Grimes was awaiting authorization for cervical injections and he would return for evaluation at the spine clinic following those injections.  Tr. 590.

On March 12, 2018, after having received injections in his neck earlier that day from his orthopedist, Grimes presented to the emergency room at Akron General complaining of shoulder pain.  Tr. 668.  Grimes saw Alexandra Rodriguez, P.A.  Tr. 672.  Grimes noted that he had increased pain in his right shoulder and he relayed that his orthopedist had told him that day that he had fluid in his shoulder and had prescribed diclofenac but his orthopedist did not think it was necessary to drain the fluid.  Tr. 668.  However, Grimes indicated to Ms. Rodriguez that he wanted to have his shoulder drained.  Tr. 668.  Physical examination revealed 5/5 strength in the bilateral upper extremities; full active range of motion in the bilateral upper extremities but with increased pain in the right shoulder on range of motion; tenderness to palpation along the right shoulder without erythema, edema, warmth, laceration, abrasion, or deformity.  Tr. 670.  Grimes had a normal mood and affect and his behavior was normal.  Tr. 670.  Ms. Rodriguez did not recommend drainage of the shoulder at the emergency department.  Tr. 671.  She noted that her

examination did not reveal concern for infection in the shoulder.  Tr. 671.  Ms. Rodriguez recommended that Grimes take the diclofenac as prescribed by his doctor and she ordered a lidocaine patch that she instructed Grimes to use as needed.  Tr. 671.

A few weeks later, on March 29, 2018, Grimes returned to the emergency room complaining of a severe headache and shoulder pain.  Tr. 691.  A CT head scan was unremarkable.  Tr. 705.  Due to there being a concern of a possible subarachnoid hemorrhage, lumbar puncture procedures were performed.  695-697.  After the various procedures/tests were performed, there was less of a concern for a subarachnoid hemorrhage.  Tr. 697.  On reevaluation, Grimes was pain free; he was moving all of his extremities and neck with no pain on movement.  Tr. 697.  There was no numbness, tingling, or sensation loss on examination.  Tr. 697.  Grimes relayed that he was comfortable going home.  Tr. 697.  He was thereafter discharged in stable condition.  Tr. 697.  At discharge, Grimes was ambulatory without complaints and he was instructed to follow up with neurology and his primary care physician. Tr. 697.

On May 17, 2018, Grimes presented to the emergency room with pain in his right hand after getting upset the prior evening and punching a wall.  Tr. 720.  He was splinted.  Tr. 722-723.  X-rays were taken which showed a fracture.  Tr. 723.  Grimes was discharged in stable condition.  Tr. 724.  In July 2018, Grimes was seen at the emergency room for complaints of increased pain to his right wrist with some occasional numbness and pain.  Tr. 751.  Grimes relayed that he had been continuing to work in a metal factory performing a lot of manual labor. Tr. 751.  He had not followed up with orthopedics and he had removed his splint after a couple of weeks.  Tr. 752.  After taking x-rays, a splint was again recommended to treat an acute

nondisplaced intra-articular fracture of the base of the fifth metacarpal.  Tr. 757.  Grimes was also instructed to follow up with the orthopedic department.  Tr. 757.

On October 29, 2018, after being hit at work by a tow motor on his left side, Grimes was seen at the emergency room at the direction of his employer to obtain medical clearance.  Tr. 736.  Grimes complained of two lumps on his left thigh with pain when walking.  Tr. 736-737.  He also complained of pain in his left elbow with movement.  Tr. 736.  On examination, Grimes was ambulatory without difficulty.  Tr. 739.  His mood and affect were normal.  Tr. 739.  Grimes was instructed to ice his elbow and leg and take over-the-counter medication for pain.  Tr. 739.  He was discharged home in good condition.  Tr. 739.

During a December 28, 2018, visit with Dr. Horne, Grimes' musculoskeletal examination revealed normal range of motion; tenderness; no edema or deformity; and low back pain with a straight leg raise on the right.  Tr. 870.  Grimes had normal range of motion in his neck.  Tr. 870.  Grimes' mood and affect were normal; his behavior was normal; and his judgment and thought content were normal.  Tr. 870.

During a follow up visit on January 3, 2019, at Akron General regarding his neck and low back pain, Grimes relayed that he had right cervical blocks administered in March with great relief.  Tr. 895.  However, his pain had returned and he was having severe pain and spasms.  Tr. 895.  Grimes was interested in another set of blocks for his neck pain and he was interested in treatment for his low back too.  Tr. 895.  It was noted that Grimes never had a caudal ESI that had been ordered.  Tr. 895.  Grimes relayed that his back pain was now radiating into his posterior thigh and he was having cramping.  Tr. 895.  Grimes' cervical examination revealed decreased range of motion, tenderness, pain and spasm.  Tr. 897.  His lumbar back examination

revealed decreased range of motion, tenderness and pain with no spasm.  Tr. 897.  Grimes'
reflexes were normal.  Tr. 897.

Medical records dated January 18, 2019 to February 11, 2019; February 4, 2019, to
February 11, 2019; March 4, 2019 to March 6, 2019; and March 29, to May 30, 2019, were
submitted to the Appeals Council after the ALJ hearing.  Tr. 2, 8-25, 26-88, 113-131, 132-158,
159-179; Doc. 14, p. 5.  The Appeals Council found that the evidence did not show a reasonable
probability that it would change the outcome of the decision and/or it did not relate to the period
at issue.  Tr. 2.  The Sixth Circuit has held that where, as here, the Appeals Council denies
review and the ALJ's decision becomes the Commissioner's decision, the court's substantial
evidence review is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d
348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v.
Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987
F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4
(6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to
determine whether substantial evidence supported [the] decision, we cannot consider evidence
newly submitted on appeal after a hearing before the ALJ.").  Thus, the evidence first submitted
to the Appeals Council is not considered herein.

### 2.    Mental health impairments

On February 24, 2017, a consultative psychological evaluation was performed by Cheryl
Benson-Blankenship, Ph.D.  Tr. 517-522.  Grimes relayed that his chronic back pain caused him
to be depressed.  Tr. 517.  He also indicated "I have bipolar disorder and depression and PTSD
for being in prison for 17 years."  Tr. 517.  When Grimes was in prison on and off for 17 years,
he had several psychiatric stays.  Tr. 517, 520.  When not incarcerated, Grimes periodically

received mental health treatment at Portage Path. Tr. 518.  Grimes reported that his "current mental health counseling and psychiatric care [was] very helpful to him."  Tr. 518.  Grimes reported a very sedentary lifestyle, difficulty sleeping, and various medical issues.  Tr. 521.  Dr. Benson-Blankenship diagnosed Grimes with bipolar I disorder; major depressive disorder, recurrent, moderate; and generalized anxiety disorder.  Tr. 520.

Dr. Benson-Blankenship assessed Grimes' functional abilities.  Tr. 521.  With respect to his abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Benson-Blankenship opined that Grimes would be "expected to understand and apply instructions consistent with low average intellectual functioning."  Tr. 521.  With respect to Grimes' abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple and multi-step tasks, Dr. Benson-Blankenship indicated that Grimes "tracked the flow of conversation adequately[]" and she opined that "[d]ue to mood lability, anxiety, and depression [Grimes] may have some mild to moderate difficulty maintaining on task and task completion."  Tr. 521.  With respect to Grimes' abilities and limitations in responding appropriately to supervision and coworkers in a work setting, Dr. Benson-Blankenship indicated that Grimes "made an unremarkable social presentation in [the] office setting [that] day[]" but she opined that "he may have some mild limitations in his ability to conform to social expectations in the work setting due to ongoing anxiety, depression, and mood issues relating to bipolar disorder."  Tr. 521.  With respect to Grimes' abilities and limitations in responding appropriately to workplace pressures in a work setting, Dr. Benson-Blankenship indicated that Grimes "reported significantly reduced stress tolerance and poor coping with pressure" and there was "a reported history of mental and emotional deterioration in

response to stressors in general."  Tr. 521.  She opined that Grimes "would have moderate difficulty in coping with workplace pressures at the present time."  Tr. 521.

On March 1, 2017, state agency reviewing psychologist Patricia Kirwin, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 233-234) and Mental RFC Assessment (Tr. 236).  In the PRT, Dr. Kirwin found that Grimes had moderate limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or mange oneself.  Tr. 234.  Dr. Kriwin indicated that Grimes' current functioning was essentially the same as it was at the time of the ALJ's May 8, 2015, decision. Tr. 234.  Dr. Kirwin adopted the prior ALJ's RFC dated May 8, 2015.  Tr. 236.

Upon reconsideration, on July 6, 2017, state agency reviewing psychologist Courtney Zeune, Psy.D., completed a PRT (Tr. 246-247) and Mental RFC Assessment (Tr. 757-758), wherein she reached findings similar to those of Dr. Kirwin and adopted the prior ALJ's RFC dated May 8, 2015.  Tr. 246-247, 248-249.

On November 19, 2018, Grimes presented to Portage Path as a walk-in seeking outpatient mental health services for depression, past trauma, grief/loss and anger.  Tr. 854.  Grimes had previously received outpatient mental health treatment through Portage Path.  Tr. 854.  Grimes relayed that he felt himself "getting out of control a little bit[]"; he was not sleeping; he was "[a]cting real aggressive[]"; and he had been off his medication for a "couple months[.]"  Tr. 854.  Grimes denied past or present hallucinations.  Tr. 860.  He often felt that others were against him and he did not trust others.  Tr. 860.  He reported one past suicide attempt in 2002 but denied current suicidal or homicidal ideation.  Tr. 860.  Grimes reported past violent acts and aggression, explaining that he was most recently violent the prior month towards a male coworker who had hit him with a towmotor.  Tr. 860.  Grimes indicated he "used [his] hands."

Tr. 860. Grimes relayed that he worked temp jobs, indicating he was unable to find other work because of his record, which included being in prison five times. Tr. 857, 858.

Grimes' diagnoses were major depressive disorder, recurrent severe without psychotic features; post-traumatic stress disorder; bereavement (disappearance and death of family member); rule out childhood onset fluency disorder; rule out intermittent explosive disorder; and rule out antisocial personality disorder. Tr. 861-862. Grimes declined group therapy. Tr. 861. He was referred for walk-in therapy and the medication clinic. Tr. 861.

### 3. Plaintiff's testimony

Grimes testified and was represented at the hearing. Tr. 182, 183-201, 202-204.

When asked how his condition impacted his ability to work, Grimes stated "My neck and my shoulder is really the main problem as far as me lifting. And then I got problems with my lower back and my – I got a little arthritis in my left leg and my fingers." Tr. 192. Grimes explained that his right shoulder was worse than his left, stating that his right side was "extremely swollen" according to what his doctor had told him that week. Tr. 192. Grimes had been having problems with his right shoulder for a couple of years. Tr. 192. Grimes indicated he had extreme pain, swelling and weakness in his arm. Tr. 193. At times, Grimes has problems lifting his right, but not his left, arm over his head. Tr. 193.

With respect to his left leg, Grimes explained that around 2009 he had a meniscus tear and he now has some weakness in his left leg. Tr. 193-194. When he goes up the steps, he can feel it and sometimes "[i]t just gives." Tr. 194. When the ALJ asked Grimes whether he had any problems with standing or walking, Grimes stated "Well, I walk with a -- my gait is kind of off a little bit and I walk with a little lean. I don't walk straight up like I should." Tr. 195. If Grimes sits for too long, he stiffens up and he feels burning in his lower back. Tr. 200.

As a result of prior injuries to his right hand,[3] Grimes cannot bend his pointer finger on that hand.  Tr. 194-195.  The other fingers on that same hand are crooked and bent with a little arthritis in them.  Tr. 194-195.

Grimes was taking medication for various conditions or problems, including depression, PTSD, cholesterol, anger, and sleep.  Tr. 197, 198.  Some of Grimes' medications cause headaches and stomach problems.  Tr. 197-198.  As far as other treatment that Grimes was trying, he was scheduled to have an injection for his neck and, while his neck and shoulders were the priority, they were also trying to obtain authorization for lower lumbar injections.  Tr. 201.

Even with medication, Grimes indicated he only sleeps about four hours at night.  Tr. 198.  His sleep is broken up throughout the night because of his shoulder.  Tr. 198.  When Grimes does not sleep, he indicated he "kind of get[s] off the chain a little bit."  Tr. 198.  As a result, he had returned to Portage Path to try to address the issue and some changes were made to his medications.  Tr. 198-199.

Grimes relayed that he had tried jobs through temporary agencies but was unable to stay employed due to issues with his attendance.  Tr. 199.  Grimes explained that his poor attendance was related to his pain in his lower back and his shoulder.  Tr. 199.  There were times when he was only able to work half a day.  Tr. 199.

### 4. Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr.  201-207.  The VE described Grimes' past work to include work as an auto body painter, trimmer, store laborer, and bander or baler.  Tr. 204-205.  The ALJ presented the VE with a series of hypotheticals.  Tr. 205-207.  When presented with a hypothetical question describing an individual having the same RFC as the ALJ ultimately

---

[3] Grimes is left-handed.  Tr. 194.

concluded Grimes had, the VE indicated that the individual would be unable to perform Grimes' past

work but there would be other jobs in the national economy that the described individual could

perform.  Tr. 205-206.  Those jobs were sorter, marker, and laundry folder.  Tr. 205-206.  The VE

provided national job incidence data for the three jobs.  Tr. 205-206.  The VE explained that an

individual who was off task up to 15 percent of the time would be able to perform the three jobs

identified.  Tr. 206-207.  Also, the VE testified that the acceptable level of absenteeism for unskilled,

entry-level work would typically be no more than a half to one day per month.  Tr. 207.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of

a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental
> impairment or impairments are of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations.  The five steps can be summarized as

follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be
        severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe
        impairment that has lasted or is expected to last for a continuous period of at least

twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his February 25, 2019, decision, the ALJ made the following findings:[4]

1.      Grimes has not engaged in substantial gainful activity since October 7, 2016, the application date. Tr. 99.

2.      Grimes has the following severe impairments: thoracic spinal stenosis, disc herniation at the T7-8 vertebral joint, lumbar stenosis, status post 2011 laminectomy and fusion [hereinafter, collectively, the "spinal impairment"]; osteoarthritis of the left knee; shoulder impingement syndrome; bipolar disorder; adjustment disorder; personality and conduct disorder.  Tr. 100.  Grimes' sleep apnea is a non-severe impairment.  Tr. 100.

3.      Grimes does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 100-102.

---

[4] The ALJ's findings are summarized.

4.     Grimes has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) with the following restrictions – he can never climb ladders, ropes or scaffolds but he can occasionally climb ramps and stairs; he can occasionally reach overhead with the right upper extremity and frequently handle and finger objects with the right upper extremity; he must avoid exposure to moving machinery and unprotected heights, and he can perform no commercial driving; he is able to perform simple, routine and repetitive tasks in a static work setting, defined as one with infrequent changes in the work routine with ample opportunity for such changes, as do occur, to be explained and/or demonstrated in advance, which setting is free of fast paced production demands or quotas [as is found in a piece-work environment], which setting requires no more than occasional interaction with coworkers and the public.  Tr. 102-105.

5.     Grimes is unable to perform any past relevant work. Tr. 105-106.

6.     Grimes was born in 1967 and was 49 years old, defined as a younger individual age 18-49, on the date the application was filed.  Tr. 106.  Grimes subsequently changed age category to closely approaching advanced age. Tr. 106.

7.     Grimes has at least a high school education and is able to communicate in English.  Tr. 106.

8.     Transferability of job skills is not material to the determination of disability. Tr. 106.

9.     Considering Grimes' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Grimes can perform, including laundry folder, marker, and sorter.  Tr. 106-107.

Based on the foregoing, the ALJ determined that Grimes had not been under a disability, as defined in the Social Security Act, since October 7, 2016, the date the application was filed. Tr. 107.

## V. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.  The undersigned recommends that the Court find that the ALJ did not err in his evaluation of the evidence relating to Grimes' cervical spine problems, back problems, or mental health impairments.**

Grimes argues that the ALJ did not properly evaluate evidence relating to his alleged cervical spine problems, deteriorating back problems, and mental health impairments. Doc. 14, pp. 10-14, Doc. 16, p. 1. In connection therewith, Grimes argues that the ALJ did not properly apply the res judicata principles or failed to provide the new application a fresh look and the ALJ did not conduct a proper listing analysis at Step Three. Doc. 14, pp. 13-16, Doc. 16, pp. 2-3.

In *Drummond*, the Sixth Circuit held that, "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Drummond*

*v. Comm'r*, 126 F.3d 837, 842 (6th Cir. 1997). More recently the Sixth Circuit explained that, "The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications . . . do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018). "Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934. Thus, when a claimant has previously filed an application for benefits and an ALJ has rendered a final decision, an ALJ considering a claimant's new application encompassing a different time period may find that the prior ALJ's findings are legitimate and adopt those findings absent new and material evidence. *Earley*, 893 F.3d at 933; *Drummond*, 126 F.3d at 842; AR 98-4(6), *Effect of Prior Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act -- Titles II and XVI of the Social Security Act*, 1998 WL 283902 (June 1, 1998).

Consistent with these principles, the ALJ considered the prior May 8, 2015, ALJ decision and explained that, considering that there was new and material evidence in the case, "particularly involving claimant's use of his upper extremities[]" he was not bound by the findings of the prior ALJ. Tr. 97. The ALJ then proceeded to consider the evidence, including treatment history and opinion evidence pertaining to Grimes' alleged physical and mental impairments, and he assessed Grimes' RFC. Tr. 99-105.

Grimes acknowledges that the ALJ added a severe impairment of shoulder impingement syndrome and the ALJ's RFC was more restrictive than the prior ALJ because he added "restrictions for occasionally reaching overhead with the right upper extremity and frequently

handle and finger objects with the right upper extremity."  Doc. 14, p. 12.  However, Grimes

asserts that there was no mention of Grimes' cervical spine issues and the ALJ did not add any

additional restrictions to account for his deteriorating back condition.  Doc. 14, p. 12.

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an

impairment can be considered not severe only if it is a slight abnormality that minimally affects

work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862

(6th Cir. 1988).  However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the

severity of the condition."  *Id.* at 863.  Additionally, where an ALJ finds one severe impairment

and continues with subsequent steps in the sequential evaluation process, error, if any, at Step

Two may not warrant reversal.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240,

244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was

not reversible error because the Commissioner did find a severe impairment and continued with

the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed.

Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had

found other impairments severe, the fact that some other impairments were found to be non-

severe at Step Two was not reversible error).

Thus, even though the ALJ did not identify cervical spine issues as a severe impairment

at Step Two, Grimes cannot show reversible error at Step Two.  The ALJ found that Grimes had

severe impairments, (Tr. 100), and proceeded with subsequent steps in the sequential analysis

(Tr. 100-105).  Furthermore, contrary to Grimes' claim, the ALJ considered Grimes' allegations

regarding his cervical spine issues.  Tr.  104.  For example, the ALJ specifically acknowledged:

"[a]n MRI of the cervical spine noted some degenerative disease and central stenosis at the C3-7

levels"; Grimes had been prescribed therapy for the "cervical spine"; Grimes was "referred for

pain management therapy and was treated with cervical epidural injections"; an examination showed "decreased range of motion with tenderness of the cervical spine"; and Grimes "continues to seek treatment presently with cervical facet blocks, continued to report great relief[.]" Tr. 104.   The undersigned finds that Grimes has not shown reversible error as a result of the ALJ not finding cervical spine issues to be a severe impairment.  Nor has he shown that the ALJ failed to consider his cervical spine issues when assessing his RFC.  Moreover, he has failed to demonstrate that the RFC does not sufficiently account for limitations associated with his cervical spine issues.

Grimes' claim that the ALJ failed to consider "Plaintiff's deteriorating back condition[,"] is also without merit.  Grimes asserts that the ALJ should have limited him to a sedentary level of exertion because there was evidence that the hardware from a prior back surgery had broken and that he had grade I-II spondylolisthesis at the L5-S1 level.  Doc. 14, p. 12 (pointing to Tr. 808, January 28, 2016, imaging report).   Although the ALJ did not specifically refer to the January 2016 imaging, the ALJ considered evidence relating to treatment for Grimes' back issues, including his prior fusion surgery (Tr. 103) as well as a June 30, 2017, treatment note wherein a treating orthopedic resident noted that Grimes had improved overall since his last visit and he no longer complained of leg pain (Tr. 103, citing Exhibit C9F/2 (Tr. 573)).  Also, in that same treatment note, the orthopedic resident assessed "lumbar spine pain with radicular symptoms and failed hardware[]" and indicated that Grimes was "ambulating without assistance[.]"  Tr. 573 (emphasis supplied).  Thus, Grimes' contention that the ALJ did not consider evidence relating to his back issues that post-dated the prior ALJ's decision, including evidence of broken or failed hardware, is misplaced.  Moreover, Grimes does not identify further evidence showing that, as a result of the broken hardware or imaging showing grade I-II

spondylolisthesis at L5-SI, further RFC limitations, beyond those included by the ALJ, were required.

With respect to the ALJ's consideration of his mental health impairments, Grimes asserts that it is unclear whether the ALJ provided a fresh look to the evidence pertaining to his mental health impairments as set forth in *Earley*, 893 F.3d 929.  Doc. 14, pp. 13-14.  In reaching his decision regarding the mental RFC limitations, the ALJ stated:

> The opinions of the State Agency medical file consultants who reviewed the psychological aspects of the claim are assigned great weight.  The consultants adopted the prior ALJ decision regarding the claimant's mental limitations.  As there is nothing in the record to warrant additional limitations or improvement, I find this is supported.  This is also consistent with Dr. Benson-Blankenship's consultative examination and opinion indicating mild to moderate limitations in all four areas.

Tr. 105.

Grimes takes issue with the ALJ's assignment of great weight to the state agency medical consultants' opinions, which were an adoption of the prior ALJ's May 8, 2015, decision and, he contends that "[b]eyond the findings of Dr. Benson-Blankenship, it is unclear what evidence the ALJ relied upon in his decision."  Doc. 14, p. 13.  While the ALJ ultimately concluded that there was "nothing in the record to warrant additional limitations or improvement" as compared to the mental limitations contained in the prior ALJ's May 8, 2015, decision, the ALJ did not reach this finding without providing a fresh review as instructed by *Earley*.

The ALJ considered the minimal evidence relating to Grimes' mental health treatment at Portage Path as well as opinion evidence, including the opinion of consultative psychologist Dr. Benson-Blankenship and the opinions of the state agency reviewing psychologists.  Tr. 104-105. Further, nothing in *Earley* precludes an ALJ from, after considering the record evidence, reaching the same conclusion as a prior ALJ.

Grimes has failed to show that the ALJ failed to consider evidence submitted regarding his mental health impairments.  He also has not shown that the mental limitations contained in the ALJ's RFC – "able to perform simple, routine and repetitive tasks in a static work setting, defined as one with infrequent changes in the work routine with ample opportunity for such changes, as do occur, to be explained and/or demonstrated in advance, which setting is free of fast paced production demands or quotas [as is found in a piece-work environment], which setting requires no more than occasional interaction with coworkers and the public[]" (Tr. 102) – are unsupported by substantial evidence.

Dr. Benson-Blankenship opined that Grimes was functioning in the low average range but with only mild or moderate limitations in various mental functional abilities.  Tr. 105, 521. The ALJ gave weight to this opinion, finding it to be supported by the examination and the overall record.  Tr. 105, 521.  This was not the only evidence the ALJ considered or relied upon when assessing Grimes' mental RFC.  As discussed above, the ALJ considered treatment records as well as the state agency reviewing psychologists' opinions.  Furthermore, Grimes has not shown that the Dr. Benson-Blankenship's opinion does not or cannot serve as substantial evidence to support the ALJ's mental RFC.

The undersigned finds the ALJ sufficiently considered the mental health impairment evidence and provided a fresh review of the evidence when assessing Grimes' mental RFC. Additionally, Grimes has not shown that the mental RFC is not supported by substantial evidence.

Grimes also argues that the ALJ did not properly evaluate the evidence and/or comply with regulations regarding res judicata because the ALJ did not consider the combined effects of his impairments at Step Three.  Doc. 14, pp. 14-16.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).   A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).

Grimes' Step Three argument is conclusory and/or not fully developed.  Therefore, the Court may find the argument waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted) (alterations in original).

Even if not waived, as explained below Grimes has not demonstrated error at Step Three. "In the Sixth Circuit, courts have held that 'an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record.'" *Malave v. Saul*, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted,* 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002), citing *Gooch v. Sec'y of Health*

26

*and Human Servs*., 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs*., 901 F.2d 1306, 1310 (6th Cir. 1990)) (finding that the ALJ adequately considered the combined effect of claimant's impairments; reversing on other grounds).

Here, the ALJ stated that Grimes "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]"  Tr. 100 (emphasis supplied).  In reaching this finding, the ALJ analyzed Grimes' impairments under the following listings – 1.02 (major dysfunction of a joint); 1.04 (disorders of the spine); 12.04 (affective disorders); 12.06 (anxiety-related disorders); and 12.08 (personality disorders).  Tr. 101-102.  As discussed above, Grimes has not shown that the ALJ erred in his consideration of the evidence and, a review of the decision shows that the ALJ detailed medical evidence relating to Grimes' physical and mental impairments and sufficiently analyzed Grimes' impairments in light of the entire record.  Tr. 100-105.  Moreover, as noted by the ALJ "no treating or examining physician . . . indicated findings that would satisfy the severity requirements of any listed impairment" and the state agency reviewing consultants "also reached the same conclusion[.]"  Tr. 101.  Considering the foregoing, the undersigned finds that Grimes has not shown error at Step Three.

For the foregoing reasons, the undersigned concludes that Grimes has not shown that the ALJ erred in his evaluation of the evidence relating to Grimes' cervical spine problems, back problems, or mental health impairments.

**B.      The undersigned recommends that the Court find that the ALJ did not commit error when assessing Grimes' subjective complaints of pain.**

Grimes argues that the ALJ erred by not conducting a proper assessment of his subjective pain complaints.  Doc. 14, pp. 16-19, Doc. 16, p. 3.

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 416.929(a); SSR 16-3p, 2017 WL 5180304.   When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 416.929(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 416.929(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*   The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

28

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at * 10.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Grimes argues that the ALJ failed to discuss evidence that would support a finding that he was disabled due to his pain and therefore seeks reversal of this matter for further evaluation of his subjective statements regarding his symptoms.  More particularly, Grimes argues that the ALJ failed to mention the broken hardware, cervical spine MRI, or positive straight leg raise examination finding.  Doc. 14, p. 18 (citing Tr. 526, 808, 870).

As discussed above, the ALJ did not disregard evidence relating to Grimes' cervical spine.  Indeed, the ALJ expressly discussed one of the records that Grimes contends he failed to mention, i.e., Exhibit C6F/4 (Tr. 104).  That record is a March 3, 2017, orthopedic treatment note referencing an MRI of the cervical spine that showed degenerative disease and central stenosis at the C3-7 level.  Tr. 526.

Also, as discussed above, although the ALJ did not specifically mention the broken hardware, the ALJ discussed and referred to a June 30, 2017, treatment note (Tr. 103, citing *inter alia* Exhibit C9F/2 (Tr. 573)) wherein a treating orthopedic resident assessed "lumbar spine pain with radicular symptoms and failed hardware[]" and indicated that Grimes was "ambulating without assistance[.]"  Tr. 573.  As the ALJ noted, in that same treatment note, the orthopedic

resident indicated that Grimes was ambulating without assistance and no longer complained of leg pain.  Tr. 573.

Although the ALJ did not discuss a December 28, 2018, examination finding that showed low back pain with straight leg raise on the right (Tr. 870), the ALJ did not ignore abnormal examination findings.  *See e.g.*, Tr. 104 (discussing "positive Neer and Hawkins impingement signs[]" and discussing decreased range of motion with tenderness in the cervical and lumbar spine and pain and decreased range of motion in the shoulder).  Furthermore, the ALJ did not ignore Grimes' subjective allegations of pain.  The ALJ considered those allegations in light of the entirety of the record and consistent with the regulations.  For example, the ALJ considered that Grimes declined various treatment options.  *See e.g.*, Tr. 103 (when Grimes' request for refill of Percocet was declined, Grimes "refused other options at that time[]"), Tr 461.  The ALJ also considered Grimes' response to treatment, i.e., his positive response to cervical injections. Tr. 104, Tr. 895.

It is not the role of this reviewing court to "try the case *de novo*, . . . resolve conflicts in evidence, []or decide questions of credibility."  *Garner*, 745 F.2d at 387.  Moreover, even if Grimes could demonstrate that the evidence that he claims the ALJ failed to consider supported his position that he is disabled, a reviewing court could not overturn the Commissioner's decision where, as here, there is substantial evidence to support the decision reached by the ALJ,. *Jones*, 336 F.3d at 477.

For the foregoing reasons, the undersigned concludes that Grimes has not demonstrated that the ALJ's decision is unsupported by substantial evidence nor has he demonstrated that the ALJ's consideration of his subjective allegations regarding his symptoms failed to comport with the SSR 16-3p.

**C.      The undersigned recommends that the Court find that the Step Five determination is supported by substantial evidence.**

Grimes argues that the Commissioner did not meet his burden at Step Five because the ALJ did not discuss Grimes' use of a cane and/or did not include in the RFC the need to use an assistive device and because the ALJ should have found that Grimes had the RFC to perform no more than the sedentary level of exertion.  Doc. 14, pp. 19-21, Doc. 16, pp. 1-2.

Grimes first argues that the ALJ erred because there is a treatment note authored by Dr. Pate, dated March 3, 2017, which indicates that Grimes "should continue using a cane[]"[5] but the ALJ's decision contains no mention of an assistive device.  Doc. 14, p. 20, citing 526.  Grimes is incorrect.  When assessing Grimes' impairments at Step Three, the ALJ stated "While the claimant is periodically noted to use a <u>cane</u>, this does not meet the definition set forth in the listing regarding ambulating effectively."  Tr. 101 (emphasis supplied).

Furthermore, although Dr. Pate indicated in March 2017 that Grimes ambulated with a cane and would continue to use a cane, Dr. Pate observed that Grimes' gait was normal.  Tr. 525. Also, a few months later, in June 2017, Grimes was "ambulating without assistance and he no longer complain[ed] of leg pain."  Tr. 573, Tr. 103 (ALJ decision, noting that, "Despite no indication of significant treatment, a few months later the claimant reported overall improvement in his low back pain with no further complaints of pain in the legs.") (citing Exhibit C9F/2, Tr. 573)).

Grimes further suggests that the ALJ did not consider evidence pertaining to his alleged difficulties with walking, arguing that there is no mention in the decision that Grimes "testified that his gait was off while walking."  Doc. 14, p. 20, citing Tr. 195.  This contention is also

---

[5] The treatment record states Grimes "will continue with cane[.]"  Tr. 526.

inaccurate. In his decision, the ALJ indicated that Grimes "stated that he walks with a limp due to the pain in his leg and feet as well as pain in his lower back." Tr. 103.

As detailed above, the ALJ took into account evidence of periodic use of a cane and Grimes' testimony regarding problems he had walking. Also, the medical record that Grimes points to in support of support of his claim that the ALJ erred by not including use of an assistive device in the RFC does not describe the circumstances for which the cane is needed, "i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information[.]" SSR 96-9p, 1996 WL 374185, * 7 (July 2, 1996); *Grimes v. Berryhill*, 2018 WL 2305723, at *3 (E.D. Tenn. Apr. 19, 2018), *report and recommendation adopted,* No. 3:17-CV-365, 2018 WL 2305704 (E.D. Tenn. May 21, 2018) ("A cane is medically necessary when medical documentation establishes the need for such a device to walk or stand and describes 'the circumstance for which it is needed.'" (citing Soc. Sec. Rul. 1996 WL 374185, at *7 (July 2, 1996)). Moreover, evidence that a claimant uses "'a cane at various times,' does not mean [an] ALJ [is] required to include it in [the claimant's] RFC." *Lewandowski v. Berryhill*, 2019 WL 480644, * 15 (N.D. Ohio Feb. 7, 2019) (quoting *Forester v. Comm'r of Soc. Sec.*, 2017 WL 4769006, * 4 (S.D. Ohio Oct. 23, 2017)).

Grimes also contends that the ALJ failed to satisfy his burden at Step Five because he should have limited Grimes to sedentary work and because the ALJ failed to consider the pain associated with his impairments. An ALJ is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009). While Grimes contends that the ALJ should have assessed a more restrictive RFC, he has not shown that the light exertional RFC is unsupported by substantial evidence. Additionally, as

discussed above, Grimes' argument that the ALJ erred when assessing Grimes' complaints of pain is without merit.

To satisfy his burden at Step Five, the Commissioner must make "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Secretary of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)(alteration in original).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question[].]" *Id.* (internal citation omitted). Here, the ALJ relied upon VE testimony to support his Step Five determination.

For the reasons discussed above, the undersigned finds that the ALJ's Step Five determination is supported by substantial evidence.

## VI. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 18, 2021

/s/ Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).